UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Edbert Neal Williams,                                          Civil No. 15-4042 (SRN/FLN)

                    Petitioner,

    v.                                                                **REPORT AND
                                                                              RECOMMENDATION**

Michelle Smith,

                    Respondent.

_____

Zachary Longsdorf for Petitioner Edbert Neal Williams.
Matthew Frank, James Early, and Peter Marker for Respondent.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on

Respondent's motion to dismiss Edbert Neal Williams's Petition for writ of habeas corpus as

untimely (ECF No. 11). This matter was referred to the undersigned for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below,

this Court recommends that Respondent's motion be **GRANTED**.

## I. BACKGROUND

Following a December 1996 jury trial in Ramsey County District Court, a jury convicted

Williams of one count of first-degree premeditated murder and one count of attempted first degree

murder. The undersigned accepts the facts of this case as stated by the Minnesota Supreme Court:

> Sixty-five year old Genelda Campeau was found stabbed to death in her St. Paul
> home on the evening of January 12, 1996. Genelda's 18-year old granddaughter,
> Shelly Campeau, claimed to have been attacked by the same assailant. Shelly
> suffered two stab wounds, but survived.
>
> Shelly told police officers that the assailant was Williams, her former boyfriend.
> Shelly and Williams had met and began dating in February 1993 and, in April of that
> same year, Shelly became pregnant by Williams [and their son Dominic was born in
> 1994]. . . .

According to Shelly, on January 12, 1996, Williams called her at about 5:30 p.m. and asked to see Dominic, who was visiting Shelly at Genelda's house for the weekend. Shelly agreed to let him see Dominic, and Williams arrived at Genelda's house at approximately 6:30 or 7:00 p.m. Upon entering the house, Williams removed his shoes so that he would not track snow into the house. Shelly and Williams spoke briefly about a birthday party Shelly was planning for Dominic. Shortly thereafter, Shelly left the house to speak with a friend who was waiting in his car outside. She remained outside for approximately 10 minutes.

When Shelly returned to the house, Williams, Genelda, and Dominic were in the living room. At trial, Shelly testified that neither Genelda nor Williams appeared upset at this time. However, a few days after Genelda's killing, Shelly had told a child protection worker that Williams became 'increasingly agitated' during his visit and threatened to take Dominic.

Shelly testified that when she entered the living room Genelda told her that Shelly's boyfriend had been repeatedly calling and then hanging up when Genelda answered the telephone. Shelly identified this boyfriend as Gary William Bultman. . . .

[T]he trial court suppressed evidence of Bultman's past relationship with Shelly, concluding that the evidence failed to satisfy the foundational requirements necessary for admitting evidence of a third party's prior acts.

When the trial resumed, Shelly testified that, after returning to the house, she stayed in the living room for about 5 minutes and then went to the bedroom to get a diaper for Dominic. Within a few seconds, she heard a 'thumping noise' coming from the living room. Shelly ran back into the living room and saw Williams standing over Genelda with a knife and something white in his hand. Shelly then saw Williams stab Genelda twice. Shelly tried to pull Williams off Genelda, at which point Williams turned towards her and said, 'I've been wanting to kill you for a long time.' Shelly testified that Williams then came after her with the knife, eventually stabbing her twice, once in the back and once in the chest. At trial, the doctor who examined Shelly after the accident confirmed that Shelly had suffered two stab wounds that, if deeper, may have been life threatening.

Shelly testified that when Williams stabbed her the second time, the knife blade broke and Shelly tried to run out of the house. Williams grabbed Shelly by her sweatshirt, but Shelly slipped out of the shirt and ran outside. Williams followed and the two began struggling in the yard outside of Genelda's house.

Between 7:15 and 7:30 p.m. on January 12, a woman named Donna Jo Spangler drove by Genelda's house and saw a man and a woman fighting outside of the house. At trial, Spangler testified that the woman had no shirt on and was yelling, "He killed

my grandma." According to Spangler's testimony, the man was saying, "Shut the fuck up. Shut the fuck up. I'll kill you, bitch." Spangler initially told the police that it appeared as though the woman was holding onto the man, trying to keep him from leaving, but at trial Spangler testified that the woman was trying to get away from the man. Spangler drove to a nearby Target store where she convinced an off-duty police officer to follow her back to the scene. At trial, Spangler identified Williams as the man involved in the fight.

According to Shelly, after Spangler drove off, Williams let her go, went back into the house, retrieved his shoes and jacket and left. Shelly then returned to the house, grabbed Dominic and her sweatshirt, and ran outside to get help. One of Genelda's neighbors testified that on the evening of January 12, she heard screaming from outside of her house, went outside to investigate and saw a woman standing in front of Genelda's house holding a baby and screaming, "Help. My Grandma." That neighbor then called police.

When the police arrived, Shelly told them that Williams had killed Genelda. A few blocks away, the police apprehended Williams. Police then drove Spangler, who had returned to Genelda's house with a police officer, to the scene of the apprehension where she identified Williams as the man she had seen attacking the woman. During Williams' arrest, officers observed what appeared to be blood on Williams' hands.

At approximately 9:00 p.m., an investigator from the Ramsey County Medical Examiner's Office examined Genelda's body and observed that the torso was warm and that very little rigor mortis had set in. This report, however, contradicted the observations of two officers on the scene, one of whom reported that Genelda's body was cold to the touch and the other of whom reported that some blood on Genelda's neck appeared to be dry.

An Assistant Ramsey County Medical Examiner later performed an autopsy on Genelda's body, but did not examine the body at the scene. From the investigator's report and from the autopsy, the medical examiner estimated that Genelda's death occurred between 7:00 and 8:00 p.m. on January 12, but admitted that she could not rule out earlier times. The medical examiner testified that Genelda had suffered 21 "sharp-force" injuries to her torso, neck, and head and that two of these injuries were fatal. The medical examiner concluded that Genelda's death was a homicide.

When they searched Genelda's house, the police found two portions of a broken knife blade in the kitchen and a knife handle wrapped in a white, man's athletic sock that appeared to have blood on it. The police also observed what appeared to be bloodstains in the kitchen, on the storm door, and on the back porch.

Upon booking Williams, the police photographed his hands but did not perform any tests to confirm that the substance on his hands was blood. Tests performed on

Williams' clothes were negative for any signs of blood and, although tests confirmed the presence of small amounts of blood on the inside of William's shoes, the amounts were too small to provide conclusive DNA evidence as to the source of the blood. DNA tests did, however, indicate that blood samples taken from one of the portions of the knife blade and the man's athletic sock were consistent with having come from Genelda. Samples taken from the bloodstain on the storm door were consistent with having come from Shelly. No samples were taken of or testing done on the apparent bloodstain on the porch, nor was the knife handle tested for fingerprints.

Prior to trial, Williams was placed in a cell with D.M.I., a felon with convictions for forgery and fraud. On several occasions, D.M.I. had served as a confidential informant to both local and federal law enforcement officials. At trial, D.M.I. testified that he befriended Williams and that Williams admitted to him that he had killed Genelda and attacked Shelly. D.M.I. testified that Williams subsequently offered him $1000 to kill Shelly so that she would not testify against Williams. D.M.I. contacted the police about Williams' offer and then began working with the police in a sting operation. The sting netted several recordings of telephone conversations between Williams and D.M.I. in which Williams made incriminating statements but did not expressly say that he had killed Genelda.

The jury found Williams guilty of one count of first-degree premeditated murder for killing Genelda and one count of attempted first-degree murder for attacking Shelly. The trial court sentenced Williams to life in prison for the murder and to a consecutive 180-month sentence for the attempted murder.

*State v. Williams*, 593 N.W.2d 227, 230–32 (Minn. 1999). The Minnesota Supreme Court affirmed Williams's conviction on April 22, 1999. *Id.* at 239.

Williams filed a petition for post-conviction relief in Ramsey County District Court on April 14, 2003, which was denied and then affirmed by the Minnesota Supreme Court on March 10, 2005. *Williams v. State*, 692 N.W.2d 893 (Minn. 2005). On October 8, 2013, Williams filed another state court petition for post-conviction relief, which was denied as time barred and then affirmed by the Minnesota Supreme Court on September 9, 2015. *Williams v. State*, 896 N.W.2d 316 (Minn. 2015).

On November 6, 2013, Williams filed the present petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Pet. for Habeas Corpus, ECF No. 1. In response, Respondent filed the present motion to dismiss contending that Williams's petition is untimely and equitable tolling

is not appropriate because Williams's claims are conclusory, and not supported by the record.

In opposing the motion to dismiss, Williams asserts that he has suffered from mental illness and provides records dated April 1995, August 1999, February 2004, July 2005, August 2010, January 2011, March 2011, February 2012, and February 2013 showing that he was civilly committed. Opp'n Mem. Exs. 2–10, ECF No. 13.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for habeas petitions filed by state prisoners. Specifically, the AEDPA states:

(d)(1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by the State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

It is well-established that under § 2244(d)(1)(A), the statute of limitations does not start running until either the date judgment becomes final by the conclusion of direct review or the date when the opportunity to seek such review expires:

> [T]he running of the statute of limitations imposed by § 2244(d)(1)(A) is triggered by either (i) the conclusion of all direct criminal appeals in the state system, followed by either the completion or denial of certiorari proceedings before the United States Supreme Court; or (ii) if certiorari was not sought, then by the conclusion of all direct criminal appeals in the state system followed by the expiration of the time allotted for filing a petition for the writ.

*Smith v. Bowersox*, 159 F.3d 345, 348 (8th Cir. 1998). Therefore, "'the conclusion of direct review' includes the ninety days a state court defendant has to petition the Supreme Court of the United States for a writ of certiorari." *Jihad v. Hvass*, 267 F.3d 803, 804 (8th Cir. 2011); *see also* Sup. Ct. R. 13.1.

## III. LEGAL ANALYSIS

Williams argues that although his petition is untimely, he is entitled to equitable tolling due to his mental health condition and therefore the Court should consider the merits of his petition. *See generally* ECF No. 13. The Court first observes that Williams's Petition is approximately fifteen years overdue, and that he must meet a high burden for tolling the statute due to mental illness. "[A] plaintiff seeking equitable tolling on the ground of mental incapacity must come forward with evidence that a mental condition prevented him or her from understanding and managing his affairs generally and from complying with the deadline that he seeks to toll." *Jessie v. Potter*, 516 F.3d 709, 715 (8th Cir. 2008). Courts have allowed equitable tolling based on mental illness where the complainant is institutionalized or adjudged mentally incompetent. *Lyons v. Potter*, 521 F.3d 981, 983 (8th Cir. 2008). While the Court recognizes that Williams has frequently been civilly committed due to mental impairments, it does not appear that he has been continuously committed since 1995.

6

Indeed, Williams was able to obtain counsel in order to file his first post-conviction petition in April 2003 and was able to file a second petition in 2013. Based on the record before the Court, the Court concludes that Williams has not shown that he continuously suffered from a mental illness to such an extent to justify equitably tolling the statute of limitations for the entire fifteen year period. Respondent's motion to dismiss Williams's petition must therefore be granted.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Respondent's motion to dismiss (ECF No. 11) be **GRANTED**;

2.      The Petition for writ of habeas corpus be **DENIED** and **DISMISSED WITH PREJUDICE**.


DATED: March 3, 2016                                  *s/Franklin L. Noel*
                                                     FRANKLIN L. NOEL
                                                     United States Magistrate Judge


## NOTICE:

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the

objections are filed; or (2) from the date a timely response is filed.